COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| WILLIAM D. ABRAHAM, | § | No. 08-22-00079-CV |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 243rd Judicial District Court |
| RON ACTON, DEBBIE ACTON, AARK | § | of El Paso County, Texas |
| INVESTMENTS, L.P., FEDERICO | | |
| FERNANDEZ and CAROL FERNANDEZ, | § | (TC# 2016DCV2081) |
| Appellees. | § | |

## **O P I N I O N**

This case regards the ownership of a house on El Paso's westside (the Property). Appellant William D. Abraham asserted causes of action against all Appellees for civil conspiracy and adverse possession. Abraham further asserted causes of action against Federico Fernandez and Carol Fernandez (the Fernandezes) for declaratory relief and to quiet title; against Ron Acton and Debbie Acton (the Actons) for fraud and fraudulent inducement; and against AARK Investments, L.P. (AARK) for trespass to try title and trespass to real property. Appellees collectively counterclaimed against Appellant for filing a false claim of ownership of the Property. Appellant raises ten issues in appealing the trial court's summary judgments and final judgment in Appellees' favor following a jury trial.

BACKGROUND

## A. Factual background

Appellant entered into an agreement with Ghulam Murtaza whereby the Property would ultimately be transferred to him. Because Murtaza's mortgages on the Property had due-on-sale clauses, Murtaza's attorney, Gregory Pine, structured the agreement with Appellant so as not to transfer title until closing, once Appellant paid the entire purchase price. Appellant indicated that he "had total leeway in how to structure the deal," and he has over 40 years of real estate experience. The purchase price was $380,000—with Appellant providing Murtaza a $10,000 down payment and Murtaza financing the remaining $370,000 with 7% interest through a wraparound note secured by "a vendor's lien and superior title retained in a deed of even date herewith from Ghulam Murtaza to Maker and by a deed of trust of even date from Maker to Gregory B. Pine, Trustee[.]" In September 2001, Appellant and Murtaza finalized their arrangement by signing a warranty deed with vendor's lien (the 2001 deed). The 2001 deed specified "[t]he vendor's lien against and superior title to the property are retained" pending full payment, at which point "this deed shall become absolute." The 2001 deed was not delivered to Appellant or recorded. Instead, Pine retained it and sent a copy to Appellant, which Appellant understood he could not file in the deed records. Appellant was to pay $2,461.62 per month for three years before the principal balance would come due. Appellant further agreed to pay property taxes. The Property was then leased, and the tenant's payments were applied to Appellant's debt—first through Appellant then directly to Murtaza. Appellant did not make the balloon payment in 2004. Appellant testified that he had a conversation with Murtaza and they "agreed to continue to make the monthly payments" but never modified their agreement.[1]

---

[1] Murtaza did not testify; in their briefing, Appellees indicated they were unable to locate Murtaza.

In the summer of 2008, the tenant stopped paying rent and Pine filed a complaint for forcible detainer on Murtaza's behalf. In September 2008, Appellant filed the affidavit at issue in this case (the Affidavit) in the deed records of the El Paso County Clerk's Office. In the Affidavit, Appellant asserted he owned the Property. Appellant's father, Sib Abraham (Sib), contacted Pine to pay Appellant's note in full and purchase the Property from Murtaza. Sib and Pine eventually finalized an agreement in early 2009 to purchase the Property (at a different price than what Appellant believed he owed Murtaza). The sale closed at the end of March 2009 with a payoff of $408,546.89. To fund the sale, Sib borrowed $420,000 from the Actons pursuant to a note and lien agreement. The 2009 warranty deed transferring the Property from Murtaza to Sib, which was filed along with a deed of trust, security agreement, and assignment of rents, documented the Actons' vendor's lien on the Property. The Actons believed the Property was free of other encumbrances. Appellant never withdrew the Affidavit, even after Sib purchased the Property. Over the next several years, Sib and the Actons made changes to the note and recorded the same with the El Paso County Clerk to modify the 2009 warranty deed. In the last modification in 2011, the Actons loaned Sib an additional $100,000 and executed and filed another deed of trust, security agreement, and financing statement evidencing the additional lien on the Property. Sib made the required payments until his death in 2014.

After Sib's death, the note payments stopped. The Actons' attorney received court approval to foreclose on the Property. The foreclosure was scheduled for December 1, 2015. On November 30, 2015, Appellant filed a temporary restraining order to prevent foreclosure and unsuccessfully attempted to purchase the Property. On December 1, 2015, the foreclosure sale took place and the Actons became owners of the Property. After the foreclosure, Appellant continued to attempt to buy the Property from the Actons. The Actons and Appellant never reached an

3

agreement. On March 28, 2016, the Actons sold the Property to AARK. The Actons did not become aware of the Affidavit before selling the Property.

After AARK purchased the Property, Albert Apodaca, a partner in AARK, became aware of a lis pendens on the Property and a lawsuit against AARK. According to Apodaca, the lis pendens referred to a lawsuit wherein "Appellant D. Abraham filed an affidavit of ownership" to the Property. The original petition referred to the Affidavit as filed and recorded. Because the title company informed Apodaca it would remove the cloud from the title, AARK began entertaining offers to sell the Property.

AARK entered a contract with the Cowans to sell them the Property for a cash sum of $500,000 and a closing date of April 15, 2017. The Cowans informed AARK they objected to purchasing the Property without a release of the lis pendens. Apodaca met with Appellant about the matter, but Appellant claimed the Property was his and refused to release the lis pendens. Appellant told Apodaca he should sue the title company for failing to notify AARK of the cloud on the title. On November 13, 2017, the Cowans terminated their purchase agreement because the lis pendens remained.

AARK continued trying to sell the Property. It was unable to do so until 2019. Between the Cowan contract termination and the 2019 sale, AARK paid $10,649.40 in property taxes on the Property. On August 15, 2019, the Fernandezes purchased the Property from AARK for $450,000. The Fernandezes paid a $10,000 down payment and AARK carried the $440,000 note, maintaining a vendor's lien on the Property. From the date of purchase to the time of trial, the Fernandezes continued to make payments on the note.

**B. Procedural history**

On June 1, 2016, Appellant filed his original petition against the Actons and AARK, attaching a copy of the 2001 deed, the Affidavit, and the lis pendens. On October 15, 2020, Appellant added the Fernandezes as defendants. On January 25, 2021, Appellees counterclaimed alleging Appellant fraudulently asserted a claim on the Property by the 2001 deed and the Affidavit in violation of Texas Civil Practices and Remedies Code Chapter 12.

In February 2021, Appellant filed a traditional summary judgment motion on his adverse possession claim against Appellees and a no-evidence summary judgment motion on Appellees' counterclaim and affirmative defenses. In March 2021, Appellees filed a motion for traditional and no-evidence summary judgment on Appellant's claims: to quiet title, trespass to try title, trespass to real property, fraud, and fraudulent inducement. Appellees also sought a no-evidence summary judgment on Appellant's civil conspiracy claim and traditional summary judgment on Appellant's adverse possession and declaratory judgment claim. The trial court granted Appellees' motions for traditional and no-evidence summary judgment and denied Appellant's motions for summary judgment, which dismissed all of Appellant's causes of action against Appellees. Appellant filed a motion for new trial, which the trial court denied.

In October 2021, the parties went to trial on Appellees' Texas Civil Practices and Remedies Code Chapter 12 counterclaim.

## C.  The trial

At the jury trial, Appellant presented evidence to show that after the 2001 deed was signed, he, not Murtaza, rented the Property to various tenants. Alexis Acosta, a former tenant, testified that he rented the Property from Appellant and lived there from 2001 to 2008.[2] According to Acosta, Appellant undertook major repairs on the Property, including replacing the carpet,

---

[2] The residential lease dated February 2005 reflects Murtaza as the landlord and Acosta as the tenant.

replacing appliances, repairing the swimming pool, and painting. Acosta made payments directly to Murtaza because that was more convenient for him and Appellant. In 2008, Acosta received eviction documents from Murtaza and contacted Appellant for help.

Ray Ruz, a property manager, testified that he helped find tenants and manage the Property for Appellant, who paid him to do so. According to Ruz, Appellant continued to maintain and improve the Property during the next tenant's lease. Although Ruz could not recall exactly when he assisted Appellant, he was certain it was after 2009 and while Sib was still alive.

Appellant testified at trial as follows. Appellant believed he had purchased the Property from Murtaza on September 11, 2001. Appellant agreed the original deed was to remain unfiled because Murtaza's underlying debt contained a due-on-sale clause. Appellant was not concerned about recording the 2001 deed because the recording was not necessary to consummate the purchase but "would only put the world on notice." He paid Murtaza a $10,000 downpayment and executed a note to Murtaza with monthly payments and a balloon payment after three years, which obligated Appellant to pay Murtaza the full $380,000. When the balloon payment came due, Appellant met with Murtaza, and they agreed to continue the monthly payments, increasing them to $3150 going forward to account for the tax escrow payments, yet they did not modify their contract. Appellant had also paid the tax escrow shortages from time to time with company checks from two sole proprietorships.

Appellant was surprised when Murtaza sent Acosta an eviction notice because Appellant believed he owned the Property. Appellant filed the Affidavit to protect his interest in the Property until the matter was resolved. He believed any subsequent purchaser would be protected by his filing, and he did not intend to harm anyone. At the time of his filing, Appellant was not aware of and did not contemplate the Actons, Apodaca, or the Fernandezes "ever being involved with this property."

6

Appellant instructed Acosta to speak with Sib to resolve the ownership issue and the eviction notice. Appellant informed Sib that he owned the Property and had been making payments for eight years. Appellant asked Sib for help with the situation. At trial, Appellant testified that Sib used Appellant's money to purchase the Property:

> And I knew my dad was going to be the spearhead on this matter. And so what I took the opportunity to do was I borrowed against one of my other properties, and I borrowed $500,000.

> And my dad and I were look [sic] brothers. What was mine was his and what was his was mine, and I had total confidence in him. So what I did was I borrowed this money on the piece of property, and I gave that to my dad. And I knew that it was over the amount that I owed [on the Property] . . . and I said, "Handle it because I'm moving on with my next project."

> He said, "I got it handled."

> .    .    .

> At that point in time, I basically exited the steering of any activity there.

Appellant did not produce any documentation showing he borrowed $500,000 against another property or gave that money to Sib. Appellant stated that he was not involved in negotiations over the Property thereafter, except to clarify the balance he owed in a letter to Pine, which was different from the purchase price Sib paid. According to Appellant, he did not learn of the deed to Sib or the $420,000 loan from the Actons used to purchase the Property until Sib died. Appellant asserted that Sib had to have been aware Appellant owned the Property when Sib obtained a loan secured by the Property.

Appellant testified that when he learned of the deed to Sib, he informed the Actons' attorney that he owned the Property. According to Appellant, he filed suit to satisfy the note the Actons had paid, to make everyone whole, and to protect his interest in the Property. In addition to the lawsuit, Appellant filed the lis pendens to prevent the Property from being conveyed without addressing his ownership interest.

Ultimately, the jury returned a verdict against Appellant, finding that he perpetuated a fraudulent lien or claim against the Property or an interest in the Property with the knowledge that the document or records were fraudulent and with the intent that the document would be given the same effect as a valid document or record. The jury further found that the Appellees were injured by Appellant's filing of the Affidavit. The jury awarded the Actons $60,000 in exemplary damages; awarded AARK $60,649.40 in actual damages and $120,000 in exemplary damages; and awarded the Fernandezes $30,000 in exemplary damages. The jury also awarded Appellees costs and attorney's fees.

The trial court entered a final take-nothing judgment against Appellant and ordered the expunction of the Affidavit and the lis pendens from the county's records. In addition to the amounts awarded by the jury, the trial court awarded Ron Acton, Debbie Acton, Federico Fernandez, and Carol Fernandez each $10,000 in statutory damages. This appeal followed. Appellant did not file a supersedeas bond or otherwise supersede the judgment.

## DISCUSSION

Appellant raises ten issues on appeal: (1) the trial court erred in granting the Actons' summary judgment motion on the trespass to try title claim; (2) the trial court erred in granting the Fernandezes' summary judgment motion on the suit to quiet title; (3) the trial court erred in granting AARK's summary judgment motion on the trespass to real property claim; (4) the trial court erred and abused its discretion in granting the Actons' summary judgment motion on the trespass to try title claim; (5) the trial court erred in denying Appellant's summary judgment motion on the Actons' counterclaim; (6) the Actons and AARK lacked standing under Chapter 12 and the court thus lacks jurisdiction; (7) there was no evidence Appellant intended to injure the Actons by filing the Affidavit; (8) any injuries the Actons suffered were not the result of Appellant

filing the Affidavit; (9) the exemplary damages are excessive as a matter of law and must be eliminated or substantially reduced; and (10) summary judgment error infected the trial.

Appellant's sixth issue regarding the Actons' and AARK's standing and the court's jurisdiction is addressed first. The remaining issues are addressed in the following categories: mooted issues, summary judgments, legal sufficiency, exemplary damages, and whether summary judgment error infected the jury trial.

## STANDING

In his sixth issue, Appellant argues Appellees lack standing for the following reasons: (1) neither the Actons nor AARK were authorized to sue under Texas Civil Practice and Remedies Code § 12.003 because they did not have "any interest in the property, nor were either obligors or debtors with respect thereto[] at the time the counterclaim was filed"; and (2) none of the Appellees pleaded or proved any legally cognizable injury. Appellant asserts that because the parties lacked standing to bring their Chapter 12 counterclaim, the trial court lacked subject matter jurisdiction to hear the case.

Subject matter jurisdiction is essential to a court's authority to decide a case. *SCI Texas Funeral Servs., Inc. v. Hijar*, 214 S.W.3d 148, 153 (Tex. App.—El Paso 2007, pet. denied) (op. on reh'g). Standing relates to subject matter jurisdiction because a court has no jurisdiction over a claim where a plaintiff does not have standing. *Vee Bar, Ltd. v. BP Amoco Corp.*, 361 S.W.3d 128, 131 (Tex. App.—El Paso 2011, no pet.). The issue of standing may be properly raised for the first time on appeal and cannot be waived by the parties. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). Whether a party has standing is a question of law subject to de novo review. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

9

When a statute confers standing, "the analysis is a straight statutory construction of the relevant statute to determine upon whom the Texas Legislature conferred standing and whether the claimant in question falls in that category." *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding [mand. denied]). Under Texas Civil Practice and Remedies Code§ 12.003, "the obligor or debtor, or a person who owns an interest in the real or personal property" may bring an action to recover damages under Chapter 12 for another's perpetrating a fraudulent interest in the property. TEX. CIV. PRAC. & REM. CODE ANN. § 12.003(a)(8).

### A.   No interest in the Property required at time of Chapter 12 counterclaim filing

Here, all of the Appellees argue Appellant violated Texas Civil Practice and Remedies Code Chapter 12 by maintaining a fraudulent interest in the Property during a time they "were each the owners of the Property." And, citing a Fifth Circuit case regarding Chapter 12, they contend "[n]othing in the language of the statute limits the right to sue to the current owners of the subject property." They further argue the Chapter 12 cause of action "is to provide a remedy for the acts constituting a violation of the Statute" to a person who has an ownership interest in property and "[t]here is no reason why a party that subsequently sells the property should lose this remedy." Appellant, on the other hand, contends that because the statutory language is present-tense, and based on a plain-language reading of the statute, a Chapter 12 suit may be filed only by a person who is an obligor or debtor or owns an interest in the Property at the time the suit is filed. And Appellant argues that only the Fernandezes owned an interest in the Property at the time Appellees filed the counterclaim.

### (1) AARK's interest in the Property

AARK owned the Property from the time it purchased the Property from the Actons in 2016 to the time it sold the Property to the Fernandezes in 2019. And when it sold the Property to the Fernandezes, AARK maintained a vendor's lien on the Property to secure its $440,000 loan. AARK maintained this interest in the Property through the time of trial.

### (2) Actons' interest in the Property

In 2009, the Actons acquired their interest in the Property through their $420,000 loan to Sib secured by the Property, which they foreclosed on in December 2015. The Actons then sold the Property to AARK in 2016 and did not retain an interest in the Property thereafter. Appellees filed their Chapter 12 counterclaim in 2021.

### (3) Analysis

While this particular issue regarding Chapter 12 standing is a matter of first impression in Texas courts, the Fifth Circuit squarely considered and rejected the argument that a claimant must be a present obligor, debtor, or interest-holder to file and maintain a Chapter 12 suit.[3] *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 692 F.3d 358 (5th Cir. 2012). In *Vanderbilt*, a fraudulent lien was released before a previous property-interest holder intervened with Chapter 12 claims against the purported lienholders. *Id*. at 362. The purported lienholders argued that the previous property-interest holder did not have standing to sue under Chapter 12 because (1) the lien "against them was released before they intervened, such that they were no longer 'obligor[s] or debtor[s]' under the fraudulent lien, and (2) they had already conveyed their interests in the property before they intervened, such that they were no longer 'person[s] who own[] an interest in the real . . .

---

[3] The *Vanderbilt* court also acknowledged that "Texas courts have rejected the argument that a Chapter 12 damages claim is mooted when a defendant unilaterally releases an allegedly fraudulent lien after the claim was filed but before trial or final judgment." *See Esau v. Robinson*, No. 13-06-00484-CV, 2008 WL 2375861, at *1-2 (Tex. App.—Corpus Christi June 12, 2008, no pet.) (mem. op.).

11

property.'" *Id.* at 370 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 12.003(a)(8)). The court explained: "Generally, there is standing once a plaintiff has suffered a legally cognizable injury or wrong for which the law provides a cause of action to seek redress." *Id.* And although the court generally evaluates standing when a party files a lawsuit, "standing for a party complaining of a concrete past violation of a statutory right does not evaporate merely because the defendant has since ceased to violate that right." *Id.; see also Bowers v. Matula*, 943 S.W.2d 536, 539 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Instead, the court made clear that "*a live controversy continues* as to whether the [party's] actions *constituted* a violation of Chapter 12, entitling the [other party] to recover statutory damages." *Id.* at 371 (emphasis added). Accordingly, we conclude that all three Appellees—each of whom was an obligor, debtor, or property-interest holder during the time of the alleged fraudulent claim on the Property—had standing to bring Chapter 12 claim against Appellant, and the court therefore had subject matter jurisdiction over the counterclaim.[4]

## B. No actual injury required to maintain a Chapter 12 cause of action

The Texas Legislature has created several statutory schemes that allow for statutory damages without evidence of actual damages. *See Vanderbilt Mortg. & Fin.*, 692 F.3d at 372 n.12 (giving examples of such statutory schemes). Chapter 12 is one such statutory scheme that provides recovery for the greater of fixed statutory damages or actual damages. TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(b)(1) (providing for recovery of the greater of $10,000 or actual damages caused by the violation); *see also Roman v. Ramirez*, 573 S.W.3d 341, 351 (Tex. App.—El Paso 2019, pet. denied) (holding Chapter 12 allows statutory damages without evidence of actual damages). TEX. CIV. PRAC. & REM. CODE ANN. § 12.002.

---

[4] Appellant did not raise limitations as an affirmative defense; therefore, we do not address it as a bar to the Chapter 12 counterclaim in the present case.

For the reasons set forth above, we hold that all of the Appellees had statutory standing to sue under Chapter 12, and none were required to plead or prove an actual injury to have a cognizable legal claim. We therefore overrule Appellant's sixth issue.

## MOOTED ISSUES

A case is moot if a controversy no longer exists between the parties. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005). A case can become moot at any stage of the legal proceedings, including on appeal. *Id*. Courts of appeal are prohibited from deciding moot cases. *Nat. Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999) ("This prohibition is rooted in the separation of powers doctrine in the Texas and United States Constitutions that prohibits courts from rendering advisory opinions."). Subject matter jurisdiction, essential to a court's power to decide a case, is implicated by the mootness doctrine because the court has no jurisdiction over moot cases. *See Dominguez v. Dominguez*, 583 S.W.3d 365, 370 (Tex. App.—El Paso 2019, pet. denied) (where the appellant's challenge to a judgment against him on a trespass to try title claim was mooted by sale); *see also State v. Naylor*, 466 S.W.3d 783, 791-92 (Tex. 2015) (discussing the jurisdictional scope of a court of appeals). In a cause of action involving property, the sale of the subject property may render related issues moot. *See F.D.I.C. v. Nueces County*, 886 S.W.2d 766, 767 (Tex. 1994) (where the controversy between competing lienholders was mooted by foreclosure); *Estate Land Co. v. Wiese*, 546 S.W.3d 322, 326 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (where the appellant's challenge in a partition case was mooted by sale); *Moss-Schulze v. EMC Mortg. Corp.*, 280 S.W.3d 876, 877 (Tex. App.—El Paso 2008, pet. denied) (where appeal arising out of attempted foreclosure was mooted by foreclosure).

**A. Appellant's trespass to try title claim is moot**

In his first issue, Appellant argues the trial court erred in granting Appellees' summary judgment motion on his trespass to try title claim. Appellees argue the claim has become moot because the Fernandezes have sold the Property.

A trespass to try title claim is the method to determine who has superior title among parties. TEX. PROP. CODE ANN. § 22.001; *Brumley v. McDuff*, 616 S.W.3d 826, 831-32 (Tex. 2021). In a trespass to try title claim, the plaintiff seeks the right to present possession of the property in question. *Lance v. Robinson*, 543 S.W.3d 723, 736 (Tex. 2018). Here, Appellant's trespass to try title claim sought a permanent injunction, writ of possession, and that the Fernandezes be permanently enjoined from using and possessing the Property.

The trial court granted Appellees' summary judgment motion on this claim. After a jury trial on Appellees' counterclaim, the trial court entered a final take-nothing judgment against Appellant. Appellant appealed the summary and final judgments but did not post a supersedeas bond or otherwise supersede the judgment. The Fernandezes thereafter sold the Property to a third party. In this case, the sale of the Property renders Appellant's first issue moot due to the nature of the relief requested. *See Dominguez*, 583 S.W.3d at 372 (where the appellant's challenge to a judgment against him on a trespass to try title claim was mooted by sale).

**B. Appellant's suit to quiet title is moot**

In his second issue, Appellant argues the trial court erred in granting Appellees' motion for summary judgment on his suit to quiet title. Appellees argue the claim has become moot because the Fernandezes have sold the Property. A suit to quiet title is an equitable remedy to remove a cloud on a property's title. *Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied). In a suit to quiet title, the plaintiff seeks to declare the defendant's title invalid or

14

ineffective. *Id*. Here, Appellant's suit to quiet title sought an order stating he owned one hundred percent of the Property and the Fernandezes' claim was void.

The trial court granted Appellees' motion for summary judgment on Appellant's suit to quiet title. After a jury trial on Appellees' counterclaim, the trial court entered a final judgment against Appellant. Appellant appealed the summary and final judgments but did not post a supersedeas bond. For the same reason as articulated above, the Fernandezes' sale of the Property to a third party renders Appellant's second issue moot due to the nature of the relief requested.

Therefore, without reference to the merits, we overrule Appellant's first and second issues because they are moot.

## SUMMARY JUDGMENT ISSUES

In his third, fourth, and fifth issues, Appellant argues the trial court erred in granting Appellees' no-evidence motions for summary judgment and denying Appellant's no-evidence motions for summary judgment.

We review a trial court's granting of summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018); *Chau v. Select Med. Corp.*, 582 S.W.3d 413, 419 (Tex. App.—Eastland 2018, pet. denied). "When, as here, the trial court does not specify the grounds upon which it grants summary judgment, 'we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious.'" *Haynes v. DOH Oil Co.*, 647 S.W.3d 793, 798 (Tex. App.—Eastland 2022, no pet.) (quoting *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003)). "If summary judgment could have been rendered, properly or improperly, on a ground not challenged, the judgment must be affirmed." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App.—El Paso 2010, no pet.).

**A. Any error in granting Appellees' no-evidence summary judgment motion on Appellant's trespass to real property claim was harmless**

Here, Appellees moved for both a traditional and no-evidence summary judgment on Appellant's trespass to real property claim. The trial court granted the motion for summary judgment in its entirety without specifying its grounds. On appeal, Appellant argues the trial court erred when it granted the no-evidence motion for summary judgment on his trespass to real property claim but does not raise any issue challenging the ruling on his traditional summary judgment motion. Even if we were to construe Appellant's general language asking this court to reverse the trial court's grant of summary judgment on both grounds, we decline to do so. The first element of trespass to real property requires evidence showing he owned or had a lawful right to possess the Property. *Salazar v. Sanders*, 440 S.W.3d 863, 876 (Tex. App.—El Paso 2013, pet. denied.) And our analysis below concludes the opposite.

Therefore, we overrule Appellant's third issue.

**B. The substance of Appellant's fourth issue relates to the trespass to real property claim and any error was harmless**

In his fourth issue, Appellant asserts the trial court erred in granting Appellees' no-evidence summary judgment motion on his trespass to try title claim. However, in his argument, Appellant refers to the elements of the trespass to real property claim instead. Regardless, we have disposed of both arguments. In our mootness analysis, we determined that the claim for trespass to try title has been mooted by the Property sale.

Therefore, we overrule Appellant's fourth issue.

**C. We do not review the trial court's denial of Appellant's summary judgment motion because of the jury trial on the merits**

In his fifth issue, Appellant argues the trial court erred by denying his motion for no-evidence summary judgment on Appellees' counterclaim. Appellate courts do not review a trial

court's denial of summary judgment when there was a trial on the merits and a judgment entered on the same issues. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *Casa Palmira, LP v. Taylor Child Care, LP*, 632 S.W.3d 11, 22 (Tex. App.—El Paso 2020, no pet.) (citing *Gem Homes, Inc. v. Contreras*, 861 S.W.2d 449, 453 (Tex. App.—El Paso 1993, writ denied)). Here, a jury trial followed on Appellees' counterclaim and the jury returned a verdict. The trial court issued a final judgment rendering damages to Appellees and a take-nothing judgment against Appellant. Accordingly, we are precluded from reviewing the trial court's summary judgment determination on this issue.

We overrule Appellant's fifth issue.

## LEGAL SUFFICIENCY

In his seventh and eighth issues, Appellant argues that no evidence supports the jury's implied findings Appellant intended to injure Appellees; and even if they were injured, the Affidavit did not cause the injury.

A no-evidence challenge is essentially a challenge to the legal sufficiency. *Pearl Resources LLC v. Charger Services, LLC*, 622 S.W.3d 106, 114 (Tex. App.—El Paso 2020, pet. denied). In a legal-sufficiency challenge, the party challenging an adverse finding on which he did not have the burden of proof must demonstrate that no evidence supports the vital fact at issue. *Graham Cent. Station, Inc v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). We will overrule a legal-sufficiency challenge if more than a scintilla of evidence is offered to prove the vital fact at issue. *Id*. "In conducting our review, 'we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so.'" *Id*. (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009)). Ultimately, the test for legal sufficiency must be "whether the

17

evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

### A. More than a scintilla of evidence supported the jury's implied finding that Appellant intended to injure another

In this legal-sufficiency challenge, Appellant's argument has two parts. First, he argues the jury was not asked and did not find that Appellant intended to injure Appellees. Second, he argues there is no evidence supporting a finding that he intended to harm Appellees. We address each portion of the argument in turn.

### (1) Jury question

Under Texas Rule of Civil Procedure 279, when a ground of recovery involves multiple elements and at least one element is "submitted to and found by the jury, and one or more of [the remaining] elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon . . . [and] no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment." TEX. R. CIV. P. 279. To prevail on a Chapter 12 claim, a plaintiff must show the defendant made, presented, or used a record with (1) knowledge that the record is a fraudulent lien or claim against the real property, (2) intent that the record be given the same legal effect as a valid interest in the real property, and (3) intent to cause another person to suffer physical injury, financial injury, or mental anguish. TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(a)(1)-(3).

Here, on the record, Appellant's counsel requested that the intent element be added to Question 1. The trial court and Appellant's counsel edited Question 1. The trial court then read the edited Question 1 aloud, and Appellant's counsel did not raise an objection or issue with submitting the edited version of Question 1 to the jury. The version of Question 1 read by the court and approved by Appellant's counsel was ultimately the version submitted to the jury:

18

**Question No. 1**

Did WILLIAM D. ABRAHAM make, present or use a document or other record that was a fraudulent lien or claim against the Property or an interest in the Property with (1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property; and (2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States?

In response to Question 1, the jury found Appellant violated the first two elements of Chapter 12. The jury also found that the Appellees were injured by Appellant's filing. The jury was not asked to determine whether Appellant intended to cause another person injury. Because Question 1 contained two of the required elements for a Chapter 12 claim, we determine the omitted third element will be deemed found if it is supported by factually sufficient evidence.

We therefore examine the factual and legal sufficiency of the evidence supporting a finding that Appellant intended to cause harm to another.

**(2)   Standard of review and statutory construction**

In a factual-sufficiency challenge, an appellate court must weigh all the evidence in the record. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Wolf v. Starr*, 617 S.W.3d 898, 903 (Tex. App.—El Paso 2020, no pet.). Because Appellant challenges the jury's findings of fact on issues where the Appellees had the burden of proof, he must demonstrate there is insufficient evidence to support the jury's award. *Wolf*, 617 S.W.3d at 903. "Only where the evidence supporting the finding is so weak 'as to be clearly wrong and unjust,' will we set aside a trial court's judgment on the issue." *Id*. (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

Appellant argues the Chapter 12 intent-to-harm element requires Appellees to allege and prove he intended to harm them specifically. Before we analyze the factual and legal sufficiency, we construe Chapter 12's intent-to-harm element.

19

We review issues of statutory construction de novo. *El Paso Indep. Sch. Dist. v. Kell*, 465 S.W.3d 383, 386 (Tex. App.—El Paso 2015, pet. denied). As articulated above, our primary objective when construing the statute is to give effect to the Legislature's intent by focusing on the statutory text. *Id*. Each word and phrase must be read as if it were deliberately chosen. *Id*. "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).

The element at issue in this case requires the plaintiff to prove the defendant intended "to cause another person to suffer" injury. TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(a)(3). The portion of the statute enumerating damages states that a defendant "is liable to each injured person for" the greater of $10,000 or the actual damages caused by the violation, court costs, attorney's fees, and exemplary damages. *Id*. § 12.002(b). The difference in identifying the plaintiff as an "injured person" in the damages portion and the use of "another person" in the intent portion, implies that the Legislature did not necessarily intend for these persons to have to be the same. *Id*. § 12.002.

### (3)  Analysis

In support of the element regarding intent to harm another, the Appellees presented evidence that Appellant had owned and operated real estate for over 40 years. Pursuant to the contract between Appellant and Murtaza, Appellant agreed to pay a $10,000 downpayment and finance the remainder through Murtaza. The form of agreement between Murtaza and Appellant was disputed at trial.

According to Pine, Murtaza would not deliver the title and sell the Property to Appellant until the balance of the note was paid. Pine therefore retained the deed to the Property and did not deliver the original, which could have been filed, to Appellant. Appellant did not pay off the note.

Murtaza continued to treat the Property as his own—evicting a tenant and eventually selling the property to Sib.

In contrast, Appellant testified he believed he had purchased the Property from Murtaza in 2001. He believed the reason the 2001 deed was not given to him was to prevent Murtaza's mortgages on the Property from becoming due. Appellant believed that physical delivery of the 2001 deed was not necessary, and his property interest was protected nonetheless. Appellant also presented evidence that he treated the Property as his own—renting it, making improvements, and filing the Affidavit.

When Murtaza began evicting the tenant, Sib stepped in to purchase the Property. Appellant filed the Affidavit during the time Sib was negotiating with Murtaza and Pine. When asked about the purpose of filing the Affidavit, Appellant testified he intended to "notify the world that [he] felt in [his] heart that [he] owned that property and to preclude there being any potential problems down the road." Appellant testified he believed any subsequent purchaser would be protected by his filing. Appellant averred that he did not learn that Sib had purchased the Property as his own until Sib died. Appellant testified his father must have been aware of the Affidavit and Appellant's purported ownership of the Property when he purchased it from Murtaza.

Apodaca testified he learned of the Affidavit after his company, AARK, purchased the Property. Apodaca stated he asked Appellant to withdraw the lis pendens, and Appellant refused. Further, Appellant allegedly told Apodaca that he should sue the title company for failing to inform him of Appellant's claim.

We hold there is sufficient evidence in the record that would enable reasonable and fair-minded individuals to find Appellant intended to harm another. Jurors heard testimony regarding Appellant's years of experience in real estate and could therefore reasonably determine Appellant, in entering this arrangement where he did not receive the original deed or subsequently pay off the

21

note pursuant to the written contract terms, knew he did not own the Property. The jury could have considered Appellant's filing the Affidavit while around the same time asking Sib to purchase the Property from Murtaza an intent to fraudulently cloud the Property's title. Finally, Appellant's testimony that he contemplated subsequent purchasers would have to negotiate with him before purchasing the Property could lead a reasonable juror to conclude Appellant intended to harm others when he filed the Affidavit. Therefore, we hold that factually sufficient evidence supports the element regarding intent to harm another and deem that element found in accordance with Rule 279.

Next, we turn to Appellant's legal-sufficiency challenge. Considering all evidence in support of the element and disregarding any evidence to the contrary, we hold Appellees presented more than a scintilla of evidence that reasonable and fair-minded people could find Appellant intended to harm another. Specifically, Appellees presented the following evidence: (1) Pine's testimony that the agreement between Murtaza and Appellant was for Murtaza to retain ownership of the Property until Appellant fully paid the note, which he never did; (2) testimony that Appellant filed the Affidavit and asked Sib to negotiate with Murtaza for the Property purchase during the same time period; and (3) Appellant's testimony that he contemplated subsequent purchasers would be protected by the Affidavit, taken together with the jury's finding that Appellant knew he did not own the Property, could lead a jury to reasonably conclude the Affidavit was intended to force potential purchasers to negotiate with him. Therefore, legally sufficient evidence existed to support that Appellant intended to harm another.

We overrule Appellant's seventh issue.

22

**B.    More than a scintilla of evidence supports the jury's finding that AARK's injury was caused by the Affidavit**

In his eighth issue, Appellant argues that no evidence exists to support the jury's findings that AARK, the Actons, and the Fernandezes were injured by the Affidavit. As we discussed in our standing analysis, Chapter 12 does not require parties to prove actual injury. Therefore, we overrule this issue as it relates to the Fernandezes and the Actons, whose recovery was for statutory damages. We do, however, analyze the legal sufficiency of the evidence supporting AARK's actual damages award.

Apodaca testified AARK purchased the Property from the Actons, who were unaware Appellant had filed the Affidavit and the lis pendens. AARK then contracted to sell the Property to the Cowans for $500,000, which contract was produced at trial. The title search uncovered the lis pendens and directed the Cowans to the Affidavit. The Cowans required AARK to remove the cloud on the title in order to complete the purchase. Apodaca asked Appellant to withdraw the lis pendens and the Affidavit, but Appellant refused and instead told Mr. Apodaca to sue the title company. Apodaca testified that the Cowans indicated they were going to terminate the contract because Appellant refused to lift the encumbrance. And the Cowans, in fact, terminated the contract. AARK paid $10,649.40 in taxes on the Property thereafter for the time it retained the Property. Ultimately, in 2019, AARK was able to sell the Property to the Fernandezes for $450,000. The difference in purchase price along with the taxes AARK had to pay due to the Cowan contract failure totaled $60,649.40, the amount the jury awarded in actual damages.

Appellant argues AARK's damages were caused by the lis pendens, and the claim that the Affidavit caused the damages is too attenuated. However, the lis pendens referred to a lawsuit wherein "Appellant D. Abraham filed an affidavit of ownership" to the Property. The original petition referred to the Affidavit as filed and recorded. And the statement on the notice of lis

23

pendens merely reiterated the Affidavit claim that Appellant was the true owner of the Property. Because more than a scintilla of evidence supports the conclusion that a reasonable and fair-minded person could find the Affidavit caused AARK's damages, we hold that legally sufficient evidence supported this element.

We overrule Appellant's eighth issue.

## EXEMPLARY DAMAGES

In his ninth issue, Appellant argues the awarded exemplary damages are excessive as a matter of law and are therefore unconstitutional. The Fernandezes and the Actons concede that they are not entitled to exemplary damages absent an award of actual damages and ask that we reverse and render a final judgment removing their exemplary damages award. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004; *see also Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 753-54 (Tex. 1984) ("Under Texas law, punitive damages are not recoverable as a general rule in the absence of actual damages."); *Texas Builders v. Keller*, 928 S.W.2d 479, 482 (Tex. 1996) (reversing punitive damages award due to lack of basis upon which trial court awarded actual damages). We therefore sustain Appellant's ninth issue with respect to the Fernandezes and the Actons. Next, we turn to the question of whether the exemplary damages awarded to AARK are excessive.

### A. Applicable law and standard of review

Exemplary damages are available to punish conduct and deter its repetition, but they must comply with procedural and substantive constitutional limits. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 873 (Tex. 2017). When reviewing exemplary damages, we consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential

24

harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418. "[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . fraud." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(1).

On review, we examine the evidence in a light most favorable to the findings to determine whether legally and factually sufficient evidence supports the jury's finding that Appellant's fraud caused AARK harm. *See, e.g.*, *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 810   (Tex. App.— Houston [14th Dist.] 2019, no pet.). In terms of the clear and convincing evidence standard, we ascertain whether, based on the record before us, a reasonable juror could have formed a firm belief that the harm to AARK resulted from Appellant's fraud. *Id.* And we review de novo the constitutionality of an exemplary damage award, as to whether it is excessive as Appellant contends. *Horizon Health Corp.*, 520 S.W.3d at 874.

## B.   Reprehensibility of defendant's conduct

The reprehensibility of a defendant's conduct is "the most important indicium of the reasonableness of a punitive damages award[.]" *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

> Courts determine the reprehensibility of a defendant's conduct by considering whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct demonstrated an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Horizon Health Corp.*, 520 S.W.3d at 875 (citing *Gore*, 517 U.S. at 576-77). An exemplary damage is "suspect" in the absence of any reprehensibility factor, and, depending on the circumstances,

"[o]ne factor alone 'may not be sufficient to sustain a punitive damages award[.]'" *Bennett v. Reynolds*, 315 S.W.3d 867, 874 (Tex. 2010) (citing *Campbell*, 538 U.S. at 419). Here, the harm caused by Appellant's actions was economic; there is no allegation the health or safety of others was put at risk. Therefore, the first two reprehensibility factors are absent.

As to the third factor, AARK asserts it was financially vulnerable because Appellant's conduct would have completely deprived it of the Property. We disagree with AARK's assessment of financial vulnerability in this context. According to Apodaca's testimony, he was a licensed CPA and a real estate investor. He and his family ran AARK as a real estate investment business, and he has been investing in real estate for 33 years. Apodaca and AARK's financial condition is like that of the plaintiffs in *Jang Won Cho*, where the court determined that the targets of the fraudulent conduct were not financially vulnerable because the evidence suggested they had experience with financial transactions, real estate business, and one party was a licensed CPA operating his own office. *Jang Won Cho*, 572 S.W.3d at 812. We agree with this reasoning and hold that AARK was not financially vulnerable in this context due to its experience in real estate investments and Apodaca's qualifications as a CPA. Therefore, the third reprehensibility factor is absent.

"[T]he Supreme Court and Texas courts have clearly stated that *Campbell*'s fourth reprehensibility factor is about recidivism, not the course of conduct giving rise to the plaintiff's ultimate harm or the wrongdoers attempts to conceal his wrongdoing." *Horizon Health Corp.*, 520 S.W.3d at 875 (citing *Gore*, 517 U.S. at 577; *Bennett*, 315 S.W.3d at 874). The evidence presented by AARK regarding Appellant's actions did not include any past fraudulent filings or Chapter 12 violations. Since the record contains no evidence of any repeated similar conduct from Appellant, the fourth recidivism factor is also absent.

The fifth and final factor is whether the harm AARK suffered was a result of Appellant's intentional malice, trickery, or deceit, instead of mere accident. *Campbell*, 538 U.S. at 418. Here, the Chapter 12 counterclaim itself is rooted in deceit, i.e., a fraudulent claim against the Property. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 12.003(a)(8). At trial, evidence was presented that the agreement between Murtaza and Appellant was to transfer Property ownership once Appellant fully paid the note. Appellant did not fully pay the note. Appellant asked Sib to address the ownership issue between him and Murtaza, while around the same time filing the Affidavit claiming he owned the Property. Sib ended up purchasing the Property from Murtaza, with title transferring in March 2009, after paying the purchase price with a loan from the Actons, who retained a vendor's lien on the Property. Even after Sib purchased the Property, Appellant did not withdraw the Affidavit from the county records. When AARK became aware of the Affidavit, Apodaca asked Appellant to withdraw it, but he refused and told Apodaca to sue the title company.

Appellant asserts he believed he owned the Property since 2001 and acted consistently with his belief. According to Appellant, he filed the Affidavit to protect his interests, and his father, whom Appellant asked to step in and resolve the situation, "had to know" about Appellant's claim of ownership. Appellant claims he gave Sib $500,000 to purchase the Property. Nothing in the record corroborated this claim, and in fact, the well-documented record shows Sib borrowed money from the Actons to purchase the Property. Appellant, a real estate investor, developer, and operator with over 40 years of experience buying and selling real estate, and who has been involved in over 100 lawsuits, indicated he was "perplexed" to learn, only after Sib died, that the deed was in Sib's name rather than Appellant's because "I know that I didn't sign any documents conveying it to anybody else." When asked about blaming Sib for taking title when Appellant claims to have had it, Appellant responded "my father is an honorable man. I think it was the title company screw up."

27

Based on the record, we conclude there is legally and factually sufficient evidence upon which a reasonable jury, the fact-finder charged with assessing weight and credibility of the evidence, could have formed a firm belief Appellant acted with malice, trickery, or deceit, causing harm to AARK. Therefore, the last factor of the element assessing the reprehensibility of Appellant's behavior weighs in favor of exemplary damages.

## C. Disparity between exemplary and actual damages

The remaining elements reviewing whether the exemplary damages are constitutionally excessive are one in the same here: one is the difference between exemplary damages and actual damages suffered and the other is "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'"[5] *Campbell*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). In *Campbell*, the U.S. Supreme Court declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S. at 425. The Court did, however, confirm that awards exceeding a single digit ratio between the exemplary and actual damages will rarely satisfy due process. *Id*. The Texas Supreme Court has found that a ratio of 4.33 to 1 is constitutionally excessive in a case where only one reprehensibility factor was present. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 309-10 (Tex. 2006); *see also Horizon Health Corp.*, 520 S.W.3d at 877 (finding that a 4:1 ratio of exemplary to actual damages was excessive where only the fifth reprehensibility factor was present).

In the present case, the jury awarded AARK $120,000 in exemplary damages and $60,649.40 in actual damages—a ratio of 1.98 to 1. Exemplary damages are to deter future unlawful conduct and serve as retribution, as opposed to actual damages, which serve as redress for concrete losses. *See Bennett v. Grant*, 525 S.W.3d 642, 650 (Tex. 2017) ("As an overarching

---

[5] Because Chapter 12 authorizes the civil penalty in this case, we turn to the statute, which provides a civil penalty of the greater of $10,000 or the actual damages. TEX. CIV. PRAC. & REM. CODE ANN. § 12.002(b).

premise, exemplary damages further the state's interest in punishing and deterring unlawful conduct. But this punishment should not be so grossly excessive as to 'further[] no legitimate purpose and constitute[] an arbitrary deprivation of property.'" (citing *Bennett I*, 315 S.W.3d 867, 873 (Tex. 2010))). Here, Appellant fraudulently clouded title to the Property, the value of which hovered around half a million dollars. While AARK did not lose the sale altogether, we hold that a ratio of approximately 2:1 in this case where AARK's actual damages were $60,649.40 does not offend due process even considering only one reprehensibility factor exists.

We hold that the jury's award of exemplary damages to AARK in the amount of $120,000 was not constitutionally excessive. Therefore, we overrule Appellant's ninth issue as it relates to AARK.

### WHETHER SUMMARY JUDGMENT ERROR INFECTED THE JURY TRIAL

In his tenth issue, Appellant posits that if we agree the trial court's summary judgment was in error, then that error infected the jury trial because the trial court excluded evidence as a result of the summary judgment grant. Based on the discussion above, we have determined that these issues have either been mooted or are harmless. "After an interlocutory, partial summary judgment is granted, the issues it decides cannot be litigated further, unless the trial court sets the partial summary judgment aside or the summary judgment is reversed on appeal." *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 144 (Tex. App.—Dallas 2013, no pet.). For this reason, the trial court appropriately excluded evidence and prevented the relitigation of the summary judgment issues.

Therefore, we overrule Appellant's tenth issue.

### CONCLUSION

We sustain Appellant's ninth issue as it relates to the exemplary damages awards to the Fernandezes and to the Actons. We overrule Appellant's ninth issue as it relates to AARK. We overrule all of Appellant's remaining issues.

Accordingly, we reverse and render a final judgment that removes the Fernandezes' $30,000 exemplary damages award, removes the Actons' $60,000 exemplary damages award, and affirms the trial court's judgment in all other respects.


LISA J. SOTO, Justice

August 14, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.
Rodriguez, C.J., dissenting